**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JASON WIGGINS**,<br><br>Plaintiff,<br><br>v.<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-3399 (TNM) |

**MEMORANDUM OPINION**

Jason Wiggins and his former girlfriend both called 911 over what began as a fight about a metro card. Metropolitan Police Department (MPD) officers arrived at Wiggins's apartment complex, where they interviewed both Wiggins and his ex. Each pointed the finger at the other. In the end, the officers arrested Wiggins for making threats. A court later dismissed those charges.

Adamant that he was not at fault, Wiggins now sues the District of Columbia and two MPD officers (collectively, "Defendants"), alleging that his arrest was unlawful. That grievance manifests in a § 1983 claim, a *Monell* claim against the District, as well as several tort claims under D.C. law. Defendants move to dismiss the Complaint on a host of grounds. The Court will grant that motion. The Complaint and the materials attached to it show that probable cause justified Wiggins's arrest. That finding dooms most of Wiggins's claims. The rest fail for other reasons.

**I.**

In late 2024, MPD Officers Antonio Watson and Tiffany Williams responded to two calls for help over a domestic disturbance. *See* Compl. ¶¶ 4–5, 9, ECF No. 1-1. Jason Wiggins made

one of those calls.  *Id.* ¶ 9.  His former girlfriend made the other.  *Id.*  The two were at odds after their fight over a metro card became heated.  *See id.*

When police arrived on the scene—a housing complex—they met Wiggins by the road.  *See* Compl. ¶¶ 16–17; Pl.'s Ex. 1 to Compl. ("Watson Footage") at 16:51:23–16:51:30, ECF No. 1-1.[1].  Ofc. Williams stayed with Wiggins, while Ofc. Watson headed into the complex to find the female complainant.  *See* Watson Footage at 16:51:40–16:54:46.

In the courtyard, the witness relayed her side of the story.  Wiggins, she reported, had threatened her.  *See* Compl. ¶ 10.  She quoted him as saying, "If you put your hands on me, I'm going to bust you in your shit and this and that and have you bleeding out."  *Id.*  "So he making threats," she added, "he even making threats y'know towards the person I've been going with."  Watson Footage at 16:55:29–16:55:33.  Other details about the fight and her relationship with Wiggins followed.  *Id.* at 16:55:33–16:57:36.  Wiggins was the father of her children and still lived in the home, though she was no longer romantically involved with him.  *Id.* at 16:55:33–16:57:36.  Throughout her account she noted that her children witnessed the fight and stated that they could corroborate her story.  *See, e.g.*, *id.* at 16:56:05–16:56:06 ("My daughter even saw it."); *id.* at 16:57:05–16:57:06 ("All three of my kids they heard it.").  Ofc. Watson took down the witness's name and returned to the street without her.  *Id.* at 16:57:45–16:58:22.  He never spoke to the kids.  *See* Compl. ¶¶ 18, 23.

Back by the road, Ofc. Watson shared what he learned with Ofc. Williams.  He relayed the witness's threat accusation, though he misquoted her statement, reporting that Wiggins had said, "He was going to punch her in her damn mouth and break her jaw."  *Id.* ¶ 31; *see* Watson

---

[1]  For bodycam footage, the Court's citations refer to the time stamps displayed in white on the video.  For paper documents, the Court uses the pagination generated by the CM/ECF system.

Footage at 16:59:45–16:59:49.  Ofc. Watson also told his colleague that Wiggins's daughter corroborated her mother's account.  Compl. ¶ 25; Watson Footage at 16:59:47–16:59:49.

Ofc. Watson then spoke with Wiggins for the first time.  Watson Footage at 16:59:58–17:00:00.  Wiggins blamed his ex for the fight and told officers that she recently stirred up other trouble in their home.  *Id.* at 17:00:22–17:01:45.  He recalled that she "hopped up in [his] face," which prompted him to say, "if you put your hands on me I'm going to put my hands back on you."  *Id.* at 17:00:40–17:00:46.  After that, Wiggins said, he went to another room but she followed him with scissors.  *Id.* at 17:00:47–17:01:06.  Wiggins then called the police.  *Id.* at 17:01:25–17:01:27.  Once she saw the 911 call, Wiggins said, she called 911 too, promising to tell police that he had threatened her.  *Id.* at 17:01:25–17:01:38.  To corroborate his story, Wiggins offered to show the officers a video of her "gettin' up in [his] face."  *Id.* at 17:01:49–17:03:08.  Wiggins, however, could not provide the video when officers asked to see it.  *Id.*

At that point, the officers indicated that they would arrest Wiggins.  *Id.* at 17:03:15–17:03:18.  "There are witnesses in the house saying you made threats," Ofc. Watson told Wiggins, and because this is a domestic dispute "somebody's got to go to jail."  Compl. ¶ 35; *see* Watson Footage at 17:03:29–17:03:33.

One final attempt to locate the video followed, but Wiggins again came up empty handed.  Watson Footage at 17:04:19–17:06:35.  While searching, Wiggins continued to dispute the witness's charge.  *See id.* at 17:04:19–17:05:00.  He denied saying anything about "bussing her in the mouth."  *Id.* at 17:05:57–17:05:59.  He repeated that he had only said, "if you put your hands on me," but, officers responded, "that's not what they said."  *Id.* at 17:07:16–17:07:27.  Under the impression that his kids had sided against him, he repeatedly asked officers to

3

interview his children away from their mother. *See, e.g.*, *id.* at 17:03:23–17:03:44, 17:05:30–17:05:40; Compl. ¶¶ 18, 26.

In the end, officers arrested Wiggins. Watson Footage at 17:07:33. Ofc. Watson's affidavit supporting the arrest cited Wiggins for making "threats to do bodily harm (domestic violence)." Pl.'s Ex. 5 to Compl. at 39, ECF No. 1-1. The next day, the U.S. Attorney's Office charged Wiggins with attempted threats to do bodily harm. *See* Pl.'s Ex. 6 to Compl. at 41, ECF No. 1-1. A judge dismissed the charges three months later, after prosecutors were unprepared for trial. Compl. ¶ 62; *see* Pl.'s Ex. 7 to Compl. at 43, ECF No. 1-1.

A few months later, Wiggins filed this suit in the Superior Court for the District of Columbia. *See* ECF No. 1. He brings eight claims against the District of Columbia, and Officers Williams and Watson: malicious prosecution, false arrest and false imprisonment, intentional infliction of emotional distress, negligence or gross negligence, constitutional violations under § 1983, defamation, libel, and municipal liability. *See* Compl. ¶¶ 75–198. The District removed the case here. *See* Not. of Removal, ECF No. 1.

Though Wiggins concedes that removal was "technically proper," he asks the Court to remand the case to Superior Court. *See* Mot. to Remand at 3, ECF No. 12. Defendants oppose that request. *See* Opp'n to Mot. to Remand, ECF No. 17. They separately ask the Court to dismiss all eight claims under Rule 12(b)(6). Mot. to Dismiss, ECF No. 24. Both motions are now ripe.

## II.

Defendants move to dismiss the Complaint under Rule 12(b)(6). A complaint survives a Rule 12(b)(6) challenge only if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned

up). The Court "treat[s] the complaint's factual allegations as true and must grant the plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up). But the Court need not accept the truth of legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (cleaned up).

To resolve the motion, the Court considers only "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). A document is incorporated in the complaint if it is "referred to in the complaint" and "integral" to a claim. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

Here, that includes Ofc. Watson's body-worn camera footage. *See, e.g.*, *Bogie v. Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013) (finding video footage incorporated in the complaint and suitable to consideration of a motion to dismiss); *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) (same). The Complaint includes as an exhibit a link to Ofc. Watson's body-worn camera and references the footage throughout. *See, e.g.*, Pl.'s Ex. 1 to Compl. ("Watson Footage"), ECF No. 1-1; Compl. ¶¶ 9–19, 24–28, 30–32, 35–42, 45–46, 54–55, 77–78, 84, 94–95, 97–98, 114, 132–37, 149, 154, 157–59, 161–62, 169, 176, 184–86, 188. And the parties' briefing points the Court to the video. *See, e.g.*, Mot. to Dismiss at 12–13; Pl.'s Opp'n to Mot. to Dismiss ("Opp'n") at 5, ECF No. 25 (citing the body-worn camera footage). They dispute only the inferences the Court should draw from the footage. So the Court will consider the Watson body-cam footage alongside the Complaint and other materials "attached to" it. *See Hurd*, 864 F.3d at 678.

### III.

The Court starts, as it must, by interrogating its jurisdiction over the claims.  The Court has original jurisdiction over the federal claims.  *See* 28 U.S.C. § 1331.  And 28 U.S.C. § 1367 affords the Court supplemental jurisdiction over "all other claims that are so related" to the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution."  That jurisdictional grant includes all of Wiggins's non-federal claims because they arise from the same "common nucleus of operative fact" as his federal ones.  *Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 423–24 (D.C. Cir. 2006) (cleaned up).  Indeed, as discussed below, several of the D.C. claims rise and fall on the same probable cause analysis necessary for the federal claims.  *Accord Burney v. Suggs*, 630 F. Supp. 3d 20, 34 (D.D.C. 2022) (exercising supplemental jurisdiction over common-law claims alongside federal-law claims arising from an allegedly unlawful arrest).

Because the Court has jurisdiction over the claims here, it will deny Wiggins's motion to remand the case to Superior Court.  Mot. to Remand, ECF No. 12.  Wiggins agrees the Court has subject matter jurisdiction over the action but asks the Court to sever and remand the D.C.-law claims to Superior Court.  *Id.* at 3–4.  Section 1367(c) permits the Court to "decline to exercise supplemental jurisdiction" in some cases, but the Court will not exercise its discretion to do so here.  *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172 (1997).  Judicial economy favors resolving these claims together and no strong state interest counsels otherwise.  *See Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 15 (D.D.C. 2014), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016) (pointing to these same considerations to justify supplemental jurisdiction over state-law claims).

**IV.**

Turn now to the motion to dismiss.  The District argues that none of Wiggins's claims survive Rule 12(b)(6).  The Court agrees.  Half of the claims turn on whether probable cause justified Wiggins's arrest.  Because it did, these claims fail.  Those claims that survive the probable cause determination require dismissal for other reasons.  The Court takes each claim in turn.

**A.**

First up is Wiggins's § 1983 claim against Ofc. Williams and Ofc. Watson.  *See* Compl. ¶¶ 144–55.  Wiggins alleges that the officers violated his Fourth and Fourteenth Amendment rights by arresting him "without probable cause."  *See id.* ¶ 145.  The claim fails.

*i. Wiggins's Fourteenth Amendment Claim Fails.*  The Fourteenth Amendment "applies only to the states," and does not apply to the District's actions or those of its officials.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1953).  And yet those are the only defendants Wiggins sues.  *See* Compl. ¶¶ 4–6.  So any claim based on the Fourteenth Amendment requires dismissal.  *Accord Pointer v. District of Columbia*, 736 F. Supp. 2d 2, 5 (D.D.C. 2010).

*ii. Wiggins's Fourth Amendment Claim Fails.*  As for Wiggins's Fourth Amendment theory, this one too falls short.  D.C. officials are amenable to suit under § 1983 for Fourth Amendment violations.  *See, e.g.*, *Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 20 (D.D.C. 2021).  Officers, however, are immune from suit if they show that their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up).  To determine whether this qualified immunity applies, the Court asks whether the facts alleged "make out a violation of a constitutional right," and "whether the right at issue was clearly established at the

time of defendant's alleged misconduct." *Id.* at 232 (cleaned up).  Both prongs separately demand dismissal.  The Court exercises its discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* at 236.

To start, Wiggins forfeits any argument that the officers' actions violated clearly established law.  "Clearly established" means "that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up).  Invoking this principle, the officers argue that even if they violated Wiggins's rights, they lacked notice that the arrest was unlawful.  *See* Mot. to Dismiss at 22.  Wiggins never responds to that argument, so he concedes the point.  *See* Opp'n at 8–11; *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).  For that reason alone, the claim fails.

More, Wiggins does not plausibly allege that his arrest violated the Fourth Amendment. The Fourth Amendment protects "the right of the people . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  A warrantless arrest is an unreasonable seizure unless "there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  Probable cause "is a fluid concept" and it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 583 U.S. at 57 (cleaned up).  Whether probable cause exists turns on "the totality of the circumstances" from the perspective of "a reasonable and prudent police officer" on the scene. *United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993).

Here, the question is whether a reasonable officer would have believed that Wiggins committed the crime for which he was arrested—making a threat to do bodily harm.  *See* D.C. Code § 22-407; Pl.'s Ex. 5 at 39, ECF No. 1-1 (Ofc. Watson's affidavit describing Wiggins's

arrest for "threats to do bodily harm"). That crime requires proof "that the defendant (1) uttered words to another person (2) with a result that the ordinary hearer would reasonably believe that the threatened harm would take place." *Carrell v. United States*, 165 A.3d 314, 319–20 (D.C. 2017) (cleaned up). The speaker must also intend for his words to be threatening. *See id.* at 320.

The witness's statements provided probable cause to believe that Wiggins violated the statute. When a victim "communicates to the arresting officer information affording credible ground for believing that the offense was committed and . . . unequivocally identifies the accused as the perpetrator," probable cause exists so long as "materially impeaching circumstances are lacking." *Pendergrast v. United States*, 416 F.2d 776, 785 (D.C. Cir. 1969). The witness's statement here fits that description.

To start, she accused Wiggins of making a statement that qualifies as a threat under § 22-407. She told Ofc. Watson that Wiggins threatened her, quoting him as saying, "If you put your hands on me, I'm going to bust you in your shit and this and that and have you bleeding out." Compl. ¶ 10; *see* Watson Footage at 16:55:25–16:55:29. Wiggins maintains that the statement cannot qualify as a "true threat" because it was "conditional and framed in self-defense." Opp'n at 8. He is wrong. The statute applies to conditional threats. *See Postell v. United States*, 282 A.2d 551, 553 (D.C. 1971) ("[T]he mere fact that the infliction of the harm is upon condition does not by any means preclude it from being a threat within the meaning of the Code."); *cf. United States v. Armel*, 585 F.3d 182, 184 (4th Cir. 2009) (rejecting argument that the First Amendment prohibited prosecution for the statement, "You come and try to pull on me . . . [y]ou will die. Not by my hand, by the hand of God. Or maybe by my hand, but it will be self-defense"). And, indeed, courts routinely apply § 22-407 to statements like the one attributed to Wiggins. In *Jackson v. District of Columbia*, for example, the court found probable cause for a

§ 22-407 violation in part because the plaintiff said if someone "came at him again, the plaintiff would kill him."  541 F. Supp. 2d 334, 343 (D.D.C. 2008).

And the circumstances did not materially impeach the ex-partner's story.  True, Wiggins blamed her for what happened, but he agreed that an altercation occurred.  And he admitted that he said, "if you put your hands on me, I will put my hands on you."  Watson Footage at 17:00:40–17:00:46; *see* Compl. ¶ 27.  This admission alone likely establishes probable cause for a § 22-407 violation.  His apparently false claim to have exculpatory evidence—a video showing the witness attacking him—arguably strengthened the probable cause conclusion.  *See* Watson Footage at 17:01:49–17:03:08 (showing the officers allowing Wiggins to search for the video to no avail).  And even if these circumstances established the witness's own wrongdoing, that would not bar Wiggins's arrest.  *See Frazier v. Williams*, 620 F. Supp. 2d 103, 108 (D.D.C. 2009) ("[T]o the extent that the officers encountered two people who each appeared credible and who each claimed to be the victim of assault by the other, the police had probable cause to arrest either . . . or both." (citation omitted)).  So the "totality" of the circumstances would lead a reasonable officer to believe that Wiggins made a threat.  *See Richards v. Gelsomino*, 814 F. App'x 607, 608–09 (D.C. Cir. 2020) (affirming probable cause finding based on a victim-complaint's statement in a similar case).

In response, Wiggins offers three arguments that come up short.  First, he protests that the officers should have done more to investigate his version of events.  *See* Opp'n at 8–9, 10–11. He faults the officers for not interviewing his children and not reviewing the 911 calls.  *See id.* at 8–9; Compl. ¶¶ 18–22, 24.  This argument misunderstands the officers' duty.  "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."  *Amobi*

10

*v. D.C. Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014) (citation omitted).  Wiggins meets

this authority by citing *Wesby v. District of Columbia*, 765 F.3d 13, 21 (D.C. Cir. 2014), for the

proposition that failure to take basic investigative steps meant probable cause was lacking, Opp'n

at 9.  But the Supreme Court reversed that decision.  *Wesby*, 583 U.S. at 62.  His preferred

precedent is therefore unavailing.

Second, Wiggins argues that Ofc. Watson's false statements undermined whatever

probable cause existed.  Opp'n at 9–10.  Arrests based on intentionally or recklessly false

statements are invalid if those statements were necessary to find probable cause.  *See, e.g.*,

*United States v. Williams*, 827 F.3d 1134, 1145–46 (D.C. Cir. 2016).  Wiggins invokes this

principle, but the three falsehoods he alleges do not invalidate the arrest.  He focuses on Ofc.

Watson's alleged statement that the children independently corroborated their mother's story.

*See, e.g.*, Opp'n at 10.  Crediting Wiggins's interpretation of Ofc. Watson's statement, this was

false.  *But see infra* Part IV.G (flagging inconsistencies in Wiggins's interpretation).  Even so,

that false statement does not matter because the witness's credible accusation itself provided

probable cause.  *See Frazier*, 620 F. Supp. 2d at 108.  As a result, Ofc. Watson's statements that

the children corroborated the threat were not necessary to the probable cause determination and

thus do not invalidate Wiggins's arrest.  *See Williams*, 827 F.3d at 1145–56.

The other purported falsities come up even shorter.  Wiggins identifies an omission and a

minor discrepancy in Ofc. Watson's "*Gerstein* affidavit"—the document written to support

probable cause after the arrest.  *See generally Gerstein v. Pugh*, 420 U.S. 103 (1975).  Wiggins

faults Ofc. Watson for "omit[ing] that he never interviewed" the children.  Opp'n at 10.  But that

omission is immaterial because it would not "have defeated probable cause."  *Williams*, 827 F.3d

at 1146 (cleaned up).  Again, the witness's accusation was enough.  Up last is a discrepancy in

the affidavit. Ofc. Watson's *Gerstein* affidavit quoted the witness as saying that Wiggins threatened to "punch [her] in [her] mouth and split [her] fucking lip open," Compl. ¶ 33, which differs from the witness's statement that he threated to "bust [her] in [her] shit . . . and have [her] bleeding out," *id.* ¶ 10. These are variations on a theme: Wiggins threatened to physically harm his ex. Ofc. Watson's recitation captured the gist of that alleged threat. Because correcting Ofc. Watson's statement would not "defeat probable cause," any technical falsity is irrelevant. *United States v. Dorman*, 860 F.3d 675, 684 (D.C. Cir. 2017) (cleaned up).

Third, and finally, Wiggins describes his arrest as "predetermined," arguing that the officers' gender-based assumptions about domestic violence motivated the arrest. Opp'n at 10; *see* Compl. ¶ 84. Even if Wiggins is correct about the officers' motives, the claim could not survive. "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 153. Because the circumstances, viewed from the "standpoint of an objectively reasonable police officer," gave rise to probable cause, Wiggins's arrest was lawful. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (cleaned up).

\* \* \*

In sum, Wiggins fails to make out a plausible § 1983 claim based on the Fourth or Fourteenth Amendment. The failure of his Fourth Amendment theory is notable. The probable cause that dooms that claim requires dismissal of several others. To those claims the Court now turns.

**B.**

Next up is Wiggins's *Monell* claim against the District. Compl. ¶¶ 182–98. He claims that the District is liable for its agents' violations of his Fourth and Fifth Amendment rights. *Id.*

12

¶ 183.  Section 1983 makes the District liable only for "action pursuant to official municipal policy of some nature" that "caused a constitutional tort."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  To determine whether Wiggins's *Monell* claim is viable, the Court conducts a two-step inquiry.  *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  First, a plausible constitutional violation must exist.  *Id.*  Second, it must be plausible that a District custom or policy "was the moving force behind the constitutional violation."  *Id.* (cleaned up).  Wiggins's claim flunks this test.

Starting with the first prong, Wiggins does not plausibly allege that the officers violated his rights.  The Fourth Amendment theory fails because probable cause supported Wiggins's arrest.  *See supra* Part IV.A; *Baker*, 326 F.3d at 1306.  And though Wiggins also invokes the Fifth Amendment, he does not explain how the officers offended it.  *See* Compl. ¶¶ 144–55.  Because Wiggins offers the same facts to support both the Fifth and Fourth Amendment theories, the Court takes him to be alleging that his arrest also violated the Fifth Amendment.  *See id.*  But Wiggins cannot repackage his unlawful arrest claim in this way.  *See, e.g.*, *Matthews v. District of Columbia*, 730 F. Supp. 2d 33, 36 (D.D.C. 2010) (explaining that "[w]here a section 1983 claim alleging police misconduct arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized" as a Fourth Amendment claim (cleaned up)); *Harvey v. Kasco*, 109 F. Supp. 3d 173, 177–78 (D.D.C. 2015) (rejecting a § 1983 claim alleging that plaintiff's arrest violated "the Fifth Amendment's guarantee of substantive due process" because "[a] plaintiff may not make a substantive due process claim for police misconduct when his claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment" (cleaned up)).  Without a plausible constitutional hook for *Monell* liability, this claim fails.

More, even assuming a violation, the *Monell* claim would still fail without allegations "that a policy or custom of the District of Columbia caused the constitutional violation." *Baker*, 326 F.3d at 1306. Wiggins posits a "de facto [MPD] policy or longstanding custom of arresting men in domestic incidents based on gender-based assumptions and arrest quotas or disciplinary incentives." Compl. ¶ 187. This invokes two ways of showing a policy or custom to support *Monell* liability. His allegations, though, fall short on both fronts.

*First*, Wiggins does not allege "repeated behavior by D.C. municipal employees that have reached the level of a custom." *Givens v. Bowser*, 111 F.4th 117, 122 (D.C. Cir. 2024). To make that showing, Wiggins "must allege concentrated, fully packed, precisely delineated scenarios as proof that an unconstitutional policy or custom exists." *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (cleaned up). And he must "indicate[] the contours" of the policy or custom. *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015).

Wiggins has not done so. He attributes his arrest to the District's "entrenched custom or unofficial policy of arresting male parties in domestic incidents without proper investigation." Compl. ¶ 196; *see* Opp'n at 15. But the only factual allegations supporting that policy are Ofc. Watson's statements, "[s]omebody's got to go to jail," and "[w]e are not fittin' to get 20 days suspension for not making an arrest on a domestic scene." Compl. ¶¶ 186–87. The Court doubts that one officer's statements could establish a policy. *See Page*, 999 F. Supp. 2d at 284. Even if they could, Ofc. Watson's statements do not support a custom of *gender*-based arrests.

*Second*, Wiggins does not make out a deliberate indifference theory. "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick v.*

14

*Thompson*, 563 U.S. 51, 61 (2011). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (cleaned up).

Again, Wiggins's allegations do not cut it. He rests on conclusory accusations about the District's "deliberate failure to train" officers. Compl. ¶ 196. *Iqbal* and *Twombly* demand more. *See Page*, 999 F. Supp. 2d at 283–84 (rejecting as insufficient similarly "conclusory statements" about deliberate indifference). Another problem comes from Wiggins's allegations cutting against the District's fault. He insists, for example, that Ofc. Watson received "comprehensive" training and violated Wiggins's rights "despite [that] training," not because of it. Compl. ¶¶ 74, 101; *see* Opp'n at 15–16 (arguing that Ofc. Watson and Ofc. Williams "deviated from" MPD's "written training materials").

In sum, Wiggins's *Monell* claim fails twice over. He has not plausibly alleged a violation of his constitutional rights, nor has he plausibly alleged a municipal policy or custom behind any such violation.

## C.

Third, Wiggins's false arrest and false imprisonment claim can be quickly dismissed. *See* Compl. ¶¶ 92–111. "The elements of the torts of false arrest and false imprisonment are: (1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." *Harris v. Dep't of Veterans Affs.*, 776 F.3d 907, 911–12 (D.C. Cir. 2015). Wiggins falters on the second element. His arrest, made with probable cause, was not "unlawful." *See id.* at 912 ("The existence of probable cause for arrest defeats claims for false arrest and imprisonment.").

**D.**

Fourth, Wiggins's malicious prosecution claim cannot move forward.  *See* Compl. ¶¶ 75–91.  Under D.C. law, a malicious prosecution claim has four elements: "(1) the underlying suit terminated in plaintiff's favor; (2) malice on the part of defendant; (3) lack of probable cause for the underlying suit; and (4) special injury occasioned by plaintiff as the result of the original action." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980).  Wiggins stalls on the third.  And were that not enough, the District is not an appropriate defendant for this claim.

Start with probable cause.  "The issue in a malicious prosecution case is not whether there was probable cause for the initial arrest, but whether there was probable cause for the underlying suit." *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) (cleaned up).  But the facts that establish probable cause for Wiggins's arrest also show probable cause for his prosecution for attempted threats.  *See Jackson*, 541 F. Supp. 2d at 343 (granting defendants summary judgment on a malicious prosecution claim, pointing to the probable cause justifying plaintiff's arrest under D.C. Code § 22-407).  So this claim fails.  *See id.*

More, the claim against the District demands dismissal for the additional reason that Wiggins does not plausibly allege that the District "was responsible for the institution of the malicious proceedings." *Pitt*, 491 F.3d at 505 (cleaned up).  As Defendants point out, material attached to the Complaint shows that the U.S. Attorney for the District of Columbia—a federal official—prosecuted Wiggins.  Mot. to Dismiss at 31–32; *see* Pl.'s Ex. 6 at 41.  Faced with that exhibit, the Court need not credit Wiggins's allegation that "the Office of the Attorney General [for the District of Columbia]," a city official, "charged [Plaintiff] with one count of Threats to Do Bodily Harm." Compl. ¶ 85; *see Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (explaining that a court need not "accept as true the complaint's factual allegations insofar as

16

they contradict exhibits to the complaint").  So the malicious prosecution claim against the District fails twice over.

### E.

Fifth, Wiggins brings a claim for intentional infliction of emotional distress.  *See* Compl. ¶¶ 112–28.  To survive dismissal, he must allege "(1) extreme and outrageous conduct on the part of the [Defendants] which (2) either intentionally or recklessly (3) causes [Wiggins] severe emotional distress."  *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002).  The "extreme and outrageous" conduct requirement sets a high bar.  *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010).  Wiggins does not meet it.

At bottom, Wiggins's claim focuses on his arrest.  But run of the mill arrests, supported by probable cause, are not extreme and outrageous.  *See, e.g.*, *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007) (reasoning that because "officers had probable cause to arrest appellant, the arrest itself cannot form the basis for a claim of extreme or outrageous conduct"); *Johnson v. Paragon Sys., Inc.*, 195 F. Supp. 3d 96, 98–100 (D.D.C. 2016) (dismissing intentional infliction of emotional distress claim based on plaintiff's arrest, including two hours in handcuffs, and subsequent "threatened criminal action" after the fact).

Wiggins dresses his claim up by pointing to Ofc. Watson's alleged falsehoods.  *See* Opp'n 13–14; Compl. ¶ 113.  But Ofc. Watson's "alleged misrepresentations . . . were, at most, an *exaggeration* of conduct that already justified arrest, and not a full-fledged fabrication of criminal conduct."  *Smith v. United States*, 121 F. Supp. 3d 112, 124 (D.D.C. 2015), *aff'd*, 843 F.3d 509 (D.C. Cir. 2016).  Exaggerations of that sort are not "utterly intolerable in a civilized community," as a successful claim requires.  *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013) (cleaned up).

17

**F.**

Sixth, Wiggins claims negligence (or, in the alternative, gross negligence). Compl. ¶¶ 129–43. Like most of the claims, this one is based on Ofc. Watson's and Ofc. Williams's failure to take additional investigatory steps, like interviewing Wiggins's children. *Id.* ¶¶ 132, 133, 137. And, like those other claims, Defendants win dismissal.

Under D.C. law, a negligence claim has three elements: "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Poola v. Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016) (cleaned up). The duty element is dispositive here. Wiggins attempts to satisfy it by pointing to MPD regulations, arguing that they show Ofc. Watson's and Ofc. Williams's duty to "conduct a neutral, thorough, and unbiased investigation." Compl. ¶ 130. MPD general orders, however, "generally create no rights enforceable by the public." *Ochs v. District of Columbia*, 258 A.3d 169, 174 (D.C. 2021); *see also In re Walker*, 856 A.2d 579, 586 (D.C. 2004) (per curiam) ("[W]e have held, in a variety of factual settings, that internal policy manuals and similar documents generally do not give rise to judicially enforceable rights, for they are not statutes or regulations and have no legal force or effect.").

Faced with this authority, Wiggins pivots to arguing that the officers' actions violated a different duty. *See* Opp'n at 12–13. "District of Columbia law," he argues "recognizes police officers owe a duty to exercise reasonable care in conducting investigations." *Id.* at 12. But Wiggins did not "clearly present this theory" in his Complaint. *In re Danaher Corp. Shareholder Derivative Litig.*, 549 F. Supp. 3d 59, 74 n.9 (D.D.C. 2021). And he cannot amend his Complaint "through an opposition brief." *Id.*

Even if Wiggins had raised this negligence theory, it too would fail.  Under D.C. law, a plaintiff can bring a negligence claim based on "the same course of conduct" as an intentional tort only if "in the process of engaging in the conduct that included the intentional tort" the defendant "also breach[ed] another recognized duty owed to the plaintiff."  *Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006) (cleaned up).  In other words, a negligence claim must be "distinctly pled" and based on "a distinct standard of care."  *District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003).  Wiggins's negligence claim flunks that test because it duplicates his false arrest claim.  Both claims boil down to an argument that the officers' inadequate investigation made his arrest unreasonable.  *Compare* Opp'n at 12, *with* Compl. ¶ 94.  Wiggins "alleges no particular facts that distinguish the officers' intentional conduct from their [negligent] conduct."  *Elshazli v. District of Columbia*, 415 F. Supp. 3d 20, 27 (D.D.C. 2019).  That shortcoming is fatal.  *Accord Stewart-Veal*, 896 A.2d at 235 (affirming dismissal of a negligence claim "based on the alleged negligence of the arresting officers in conducting the arrest"); *Elshazli*, 415 F. Supp. 3d at 24–28 (granting defendants summary judgment on an excessive force claim and dismissing as duplicative a negligence claim based on the same facts).

Nor can Wiggins save the claim by arguing gross negligence.  An initial hurdle is that gross negligence is typically not a stand-alone basis for liability.  Courts typically look at whether the defendant acted with gross negligence only when "gross negligence is a specific element of a claim or defense, or for equitable reasons."  *Hernandez v. District of Columbia*, 845 F. Supp. 2d 112, 116 (D.D.C. 2012) (cleaned up); *see also, e.g.*, *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 105 (D.D.C. 2018) (same).  Wiggins does not argue that those circumstances are present here.  In any event, the claim would fail.  Gross negligence demands an "extreme departure from the ordinary standard of care," including "the failure to

19

exercise even slight care." *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997) (cleaned up). The officers' decision to arrest Wiggins with probable cause to do so does not meet that high standard.

### G.

Last up are Wiggins's defamation and libel claims. *See* Compl. ¶¶ 156–66 (Defamation); *id.* ¶¶ 167–81 (Libel). Because libel is a type of defamation the Court considers these claims together. *See Murphy v. LivingSocial, Inc.*, 931 F. Supp. 2d 21, 26 (D.D.C. 2013). To prevail, Wiggins must point to a false and defamatory statement made to a third party about him. *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005). He must also allege that Defendants acted with "at least negligence" and that the statement is actionable as a matter of law or caused special harm. *Id.* Defendants earn dismissal because Wiggins does not point to any defamatory statements.

*First*, Wiggins claims that Ofc. Watson defamed him twice by garbling the witness's description of his threat. Opp'n at 14–15. Ofc. Watson told Ofc. Williams that the witness accused Wiggins of saying, "[h]e was going to punch the complaining witness in her damn mouth and break her jaw." Compl. ¶ 157 (cleaned up). And, in his *Gerstein* affidavit, Ofc. Watson wrote the witness's description of the threat as: "Bitch, I'm not going any where [sic], I will punch you in your mouth and split your fucking lip open." *Id.* ¶ 168. These statements both misquoted the witness. According to her, Wiggins said, "If you put your hands on me, I'm going to bust you in your shit and this and that and have you bleeding out." *Id.* ¶ 10.

Ofc. Watson's misstatements are not defamatory. Recall that a defamatory statement must be "false." *Oparaugo*, 884 A.2d at 76. The question for falsity is not literal truth, but whether the "the substance, the gist, the sting, of the libelous charge can be justified."

20

*Armstrong*, 80 A.3d at 183.  Ofc. Watson's statements were not false because they contain only "[s]light inaccuracies."  *See Liberty Lobby Inc., v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988).  His statements captured the gist of the victim's statement—that Wiggins had physically threatened her.  *See* Compl. ¶ 10.  So the claims fail for lack of falsity.  *Accord Newman v. Howard Univ. Sch. of L.*, 715 F. Supp. 3d 86, 114 (D.D.C. 2024) (dismissing defamation claims because the statements were actually or substantially true).

More, Wiggins encounters another hurdle in the principle that "defamatory statements published incidental to judicial proceedings are absolutely privileged, providing the statements are relevant to the proceeding."  *Mazanderan v. McGranery*, 490 A.2d 180, 181 (D.C. 1984).  At least Ofc. Watson's *Gerstein* statement enjoys that safe harbor.  Though Ofc. Watson wrote the statement before Wiggins encountered a judge, the clear purpose of the statement was to justify Wiggins's arrest and subsequent prosecution.  Courts routinely apply the absolute privilege to similar communications.  *See, e.g.*, *Stith v. Chadbourne & Parke, LLP*, 160 F. Supp. 2d 1, 8 (D.D.C. 2001) (finding "absolutely privileged" statements in an "incident report prepared by the police").

*Second*, Wiggins claims that Ofc. Williams and Ofc. Watson defamed him by stating that his "children corroborated the alleged threat."  Compl. ¶ 160.  Recall that the witness told Ofc. Watson that her children could back her up.  *See, e.g.*, Watson Footage at 16:56:05–16:56:06; *id.* at 16:57:05–16:57:06.  And Ofc. Watson then told Ofc. Williams that the kids corroborated their mother's story.  *See id.* at 16:59:47–16:59:49.  As Wiggins argued with officers over what happened, Ofc. Williams noted "the kids said" that Wiggins threatened their mother.  Compl. ¶ 26.

Accepting Wiggins's interpretation of the officers' statements as false assertions that the officers interviewed the children, the statements are not false in a way that matters.[2]  The "sting" of the charge was not that the officers spoke to the kids.  *See Armstrong*, 80 A.3d at 183.  It was the underlying accusation that Wiggins had threatened someone that "tend[ed] to injure" Wiggins's standing in the community.  *See Howard Univ. v. Best*, 484 A.2d 958, 988–89 (D.C. 1984) (defining a defamatory remark as one that "tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community," and that "make[s] the plaintiff appear odious, infamous, or ridiculous" (cleaned up)).  And that *sting* is substantially true.  *See Liberty Lobby*, 838 F.2d at 1296.  Again, the witness said as much and told officers that her children could corroborate her story.  *See* Watson Footage at 16:56:05–16:56:06.  So the defamation claim requires dismissal.  *Accord Newman*, 715 F. Supp. 3d at 114.

## V.

Wiggins may disagree with how the officers handled his 911 call.  But that incident does not support the claims he now presses.  None of his eight claims survives Rule 12(b)(6).  And because the Court easily resolves Wiggins's D.C.-law claims alongside his federal ones, it will reject Wiggins's request to sever and remand the local claims to Superior Court.  An appropriate Order will issue today.

Dated: April 28, 2026

TREVOR N. McFADDEN, U.S.D.J.

---

[2]  In fact, Wiggins's own behavior casts doubt on this interpretation.  He repeatedly asked officers to speak with his children away from their mother.  *See, e.g.*, Compl. ¶¶ 18, 20, 26; Watson Footage at 17:03:23–17:03:44; *id.* at 17:05:30–17:05:40.  Those requests suggest that Wiggins did not understand the officers to be claiming that the children *independently* accused him of making threats.